LOUIS A. HORWITZ, PLAINTIFF-APPELLANT, v. HARRY
S. REICHENSTEIN, CITY CLERK OF THE CITY OF
NEWARK, DEFENDANT-RESPONDENT.

Argued March 15, 1954—Decided March 22, 1954.

*Mr. Irwin LeWine* argued the cause for the appellant.

*Mr. Joseph A. Ward* argued the cause for the respondent.

The opinion of the court was delivered by
VANDERBILT, C. J.

### I.

The plaintiff was a candidate for the office of ward council-man from the East Ward of Newark at the city election to be held on May 11, 1954 for the selection of a mayor, four councilmen at large and five ward chairmen, one of whom is to be chosen from each of the five wards set up for that purpose under the Mayor-Council Plan C of the Faulkner Act, *N. J. S. A.* 40:69A-55 to 40:69A-60.

In his petition for nomination the plaintiff gave as his address 168 Adams Street in the East Ward, but the superintendent of elections ruled that his residence was at 96 Pomona Avenue in the South Ward and that he would strike the plaintiff's name as a registered voter at the Adams Street address. The plaintiff did not contest the decision of the superintendent of elections.

Contending that a candidate for ward councilman does not have to be a resident of the ward in which he seeks nomination, the plaintiff brought suit in the Essex County Court against the City Clerk of Newark, seeking a declaratory judgment on the question. The defendant moved for summary judgment, which was granted. The plaintiff appealed to the Appellate Division of the Superior Court and because

of the public importance of the issue and the necessity for a speedy decision we certified the appeal on our own motion.

## II.

The appellant contends that there is no provision in law requiring candidates for the office of ward councilman to reside in the ward from which they are elected, notwithstanding the language of the Faulkner Act pertinent to this particular election:

"They shall be elected at large and *by wards* at a regular municipal election in the following manner: * * *

(d) in a municipality having five wards and nine councilmen, one councilman shall be elected *from each ward* and four at large." (Italics supplied) *N. J. S. A.* 40:69A-59.

The applicant contends that the italicized words refer only to the electorate in a designated geographical unit and not to the residence of the candidate, but this is a strained construction which does not comport with the design of the particular type of government adopted in Newark under the Faulkner Act. The Mayor-Council Plan C is intended to provide four councilmen at large representing the entire electorate of the municipality, as a United States senator represents his state, and five ward councilmen, each representing one of the new wards especially set up for the purpose of this election, *N. J. S. A.* 40:69A-13, as a congressman represents his district. Not only would lack of residence in his ward by a ward councilman imperil the representation of the ward in the sense intended by the statute, but it would lead to the overrepresentation of certain wards and the underrepresentation of others—a vice in the second branch of any legislative body.

██ At the most, all that can be said for the appellant's contention is that the language of the quoted section of the Faulkner Act is ambiguous. If so, it is our clear duty to choose that construction which will carry out the legislative intent of the statute as a whole, and that the contention urged by the appellant clearly does not do. If the Newark

Charter Commission which under the statute in the first instance had to make the choice of which of several forms of municipal government provided for in the Faulkner Act should be adopted by the city, *N. J. S. A.* 40:69A–12, had desired to have all the elective municipal officials chosen at large, it could have selected Mayor-Council Plan A, B or E providing for such an election, *N. J. S. A.* 40:69A–34, 52, 71. Instead it chose Plan C and in its report gave the reasons for this selection:

"* * * The Commission is convinced that the election of five councilmen from wards and four at large will achieve the principal advantage of both methods of election. * * *

The election of five councilmen from newly created wards will provide, *for the first time in many years*, adequate representation from all five of the major areas of the city—north, east, south, west and center. It will also enable the principal elements of our population to obtain proper representation on the municipal council. If representative government is to be effective in Newark, each important area and segment of our population should have a spokesman in the legislative body. Such representation should not be left to chance or to tie-in agreements among candidates for election at large. * * *

A particular attraction favoring the election of some councilmen from wards is the fact that ward elections will enable persons of limited financial resources to conduct door-to-door or neighborhood campaigns in their own wards, where they would be most likely to be known. The city has been deprived of the services in public office of many fine citizens * * * who have been required to be elected on a citywide basis. With ward elections, moreover, a qualified person known principally in his own ward will be able to run for ward councilman prior to establishing a citywide reputation. * * *

The election of some councilmen from wards is likely also to serve as a brake upon the domination of the city administration by a single group or political organization. * * *"

In making these comments the Newark Charter Commission was not indulging in academic political speculation. It was aware of the fact that for many years under the Walsh Act, *R. S.* 40:70–1 *et seq.,* a majority of the five city commissioners had come from a single ward and it was seeking to obviate a recurrence of that unfortunate situation.

The Faulkner Act, moreover, does not purport to stand alone, despite the appellant's contention to the contrary. Thus it provides that "the municipal election shall be * * *

conducted in the same manner, so far as possible, as the general election." *N. J. S. A.* 40:69*A*–151. It also provides that elections to fill vacancies or to replace officers who are recalled by the voters are to be conducted under the general election laws, *N. J. S. A.* 40:69*A*–60 and 40:69*A*–175. All such candidates must therefore comply with the provisions of *N. J. S. A.* 19:13–8 requiring that "Such acceptance [of a candidate] shall certify that the candidate is a *resident* of and a legal voter in the jurisdiction of the office for which the nomination is made." The same language is repeated in *N. J. S. A.* 19:23–15. Thus in all nominations under the general election laws residence is a prerequisite for every candidate. It would be absurd to require residence in order to fill vacancies or to replace removed officers and not to require it for original nominations.

Nor are these the only instances of the dependence of the Faulkner Act on the general election laws. The Faulkner Act makes no provision for soldier voting except in run-off elections and no provisions at all for absentee voting as the general election laws do, *N. J. S. A.* 19:57–1 *et seq.* It would be unthinkable to exclude soldiers and absentees from all elections held under the Faulkner Act, except soldiers in run-off elections, when they are permitted to vote in every other kind of election. Without continuing to demonstrate further the instances in which the Faulkner Act necessarily depends upon the general election laws, we cannot agree with the appellant's contention that the Faulkner Act must be construed as an entirely independent legislative scheme separate and apart in every respect from the general election laws. When the pertinent provisions of the general election laws are consulted, as we have seen, they clearly show that residence within the confines of the territory where the election is sought is a prerequisite in every instance to nomination for public office:

"We gather the sense of a law from its object and the nature of the subject matter and the whole of the context and the acts *in pari materia.* * * *" *Hackensack Water Co. v. Ruta,* 3 *N. J.* 139, 147 (1949).

Furthermore, though lacking the force of law, there is implicit in all of our thinking concerning elections, except, of course, where there is a provision of positive law to the contrary, a universal belief in this country in the political doctrine of the election of candidates residing in the vicinage. This belief is a part of the more extensive political doctrine of home rule which also lacks the force of law in the absence of statute, *Booth v. McGuinness*, 78 *N. J. L.* 346 (*E. & A.* 1910), but which nevertheless is an equally important part of our political thinking. Thus, although the United States Constitution does not require members of the House of Representatives to be selected from the district in which they are elected, Article I, Section 2, it would be unthinkable for a non-resident congressman to be elected in this country. Nor have any cases been cited of the election of non-resident state legislators. Bryce in his *American Commonwealth* (*Rev. Ed.* 1911, *Vol.* I, *p.* 183), shows that the English custom to the contrary of electing non-resident members of the House of Commons "may be due, so far as the eighteenth century is concerned, to the practice of borough-mongering under which candidates unconnected with the place were sent up by some influential person or bought the seat from corrupt corporations or limited body of freemen." Later the practice was used more legitimately to provide safe seats for members of the ministry who, unlike our cabinet officers, must be members of the House of Commons. The practice, however, was a perversion of an early requirement of the common law, expressly enacted in 1 *Henry 5, c.* 1. It was repealed in 14 *Geo.* 3, *c.* 50, though it ceased to be enforced long before its repeal, 1 *Anson, Law and Custom of the Constitution*, 83. According to Stubbs, *Constitutional History of England*, III, 424, the object of requiring residence in early times was to secure "that the House of Commons should be really a representative body." This, too, as we have seen from the report of the Newark Charter Commission, was the object of the particular type of government adopted in Newark.

We have examined the out-of-state cases cited by each party and find them without pertinence to the particular provisions of the Faulkner Act here under review.

Finally, the appellant contends that the form of petition for nomination set forth in the Faulkner Act is the same for all candidates—mayor, councilmen at large and ward councilman alike, *N. J. S. A.* 40 :69A–153, and that therefore no greater requirements are imposed on candidates for ward councilman than for mayor or councilmen at large. It is significant, however, that the form requires the addresses of both the electors who sign the petition and of the candidate nominated. Moreover, the form set forth in the statute is not immutable, for the very section in question provides that the form of petition "shall read substantially as follows."

The only change in the forms prepared and distributed by the city clerk was in the case of the ward councilman where the city clerk's form provided for showing that the signers of the petition and the candidate resided in the ward for which the nomination was made. This is in accordance with our conclusions as to the substantial question here litigated and in our view of the case the form is therefore unexceptionable.

The judgment below is affirmed but without costs.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.