229 N.J. Super. 191 (1988)
550 A.2d 1305
STATE OF NEW JERSEY
v.
ROBERT MCGINLEY, DEFENDANT. STATE OF NEW JERSEY
v.
JAMES DESTERRE, DEFENDANT. STATE OF NEW JERSEY
v.
ROBERT SHULL, DEFENDANT. STATE OF NEW JERSEY
v.
WILLIAM S. FIEL, DEFENDANT.
Superior Court of New Jersey, Law Division Burlington County.
Decided September 12, 1988.
*192 James J. Gerrow, Jr., Assistant Burlington County Prosecutor, for the State (Stephen G. Raymond, Prosecutor).
William Emmett Sitzler for Defendant Robert McGinley.
James R. Bodnar for Defendant James Desterre.
Ian M. Stuart for Defendant Robert Shull (Stuart & Olizi, attorney).
John E. Collins for Defendant William S. Fiel.

*193 OPINION
HAINES, A.J.S.C.
The opinions which follow conclude on the basis of scientific evidence, that the results of breathalyzer tests performed on persons charged with drunk driving (DWI) have a substantial margin of error requiring large adjustments or complete rejection. They will be read by some as promoting the rights of drunk drivers. They should be read as protecting the civil rights of all persons. This court has no regard for drunk drivers. It has an overwhelming regard for the rights guaranteed to all of us by our Constitutions.
Drunk drivers, for good reason, have become the object of severe legislative sanctions and strong public opprobrium. Not all who are accused, however, are guilty. Under our system of justice everyone is entitled to the protection of the law as well as its enforcement. There can be no justice without fair trials, and trials which end in convictions based on unreliable evidence are not fair.
These municipal court appeals, while not consolidated, have been argued together. They involve an identical issue: Whether breathalyzer test results may be challenged on the basis of scientific opinion which concludes that they are subject to errors amounting to as much as 50%? This opinion provides a framework for the court's consideration of the four cases, each of which is addressed separately.
The scientific evidence upon which the defendants rely shows the following: (1) The breathalyzer is designed to test persons having a 2100/1 blood-breath ratio. Such ratios in fact vary from 1100/1 to 3200/1 and the variance can produce erroneous test results. High readings are produced in 14% of the population. (2) The temperature of the machine itself varies, affecting test results. (3) Body temperatures vary, affecting test results. (4) Hematocrit (the solid particles in whole blood) levels vary, particularly between males and females, affecting test results. These sources of error make breathalyzer test *194 results suspect and, to insure reliability, require the substantial reduction of blood-alcohol percentages based on a translation of those results. The leading expert in the field, recognized as such by both State and defense, is of the opinion that the reduction should be .055.
Counsel were advised in a "preliminary" letter opinion of May 2, 1988, that the scientific opinions upon which they relied constituted an attack upon the reliability of the breathalyzer device itself and therefore an attack which could not be considered because reliability had been determined by several Supreme Court cases. In short, this court considered itself bound by principles of stare decisis. It said:

State v. Johnson, 42 N.J. 146 (1964), held that a breathalyzer (the Drunkometer) is "scientifically reliable and accurate ... without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why", quoting from State v. Miller, 64 N.J. Super. 262, 268 (App.Div. 1960). Johnson relied upon a presumption in the drunk driving statute. (Johnson also held that the presumption was "exceedingly strong in view of the stated scientific knowledge," and that the breathalyzer reading was "most difficult to overcome." [42 N.J. at 173])

Romano v. Kimmelman, 96 N.J. 66 (1984), held that breathalyzer models "900 and 900A are scientifically reliable for the purpose of determining the content of blood alcohol," with a narrow qualification relating to radio frequency interference. [at 82]

State v. Tischio, 107 N.J. 504 (1987), dealt with a statute no longer containing a presumption and held that "a blood-alcohol level of at least 0.10%, determined solely by a breathalyzer test that is administered within a reasonable time after a defendant's arrest for drunk driving, satisfies the statute...." [at 506]
The defendants in the above cases do not contend that breathalyzer test results are inadmissible. They contend that the results must be modified substantially (as much as 50% and, in any event, reduced by .055%) on the basis of new scientific evidence. That contention, however, must be considered in the light of its obvious effect. If the test results can be in error by as much as 50%, the scientific reliability of the breathalyzer itself is significantly in question. In short, the defense contention, no matter how carefully couched to reach an opposite conclusion, is an attack upon the scientific reliability of the machine itself. Since Johnson, Romano and Tischio have established the opposite conclusion and have permitted the State to carry its burden by introducing in evidence the breathalyzer test alone, I am bound to reach the same conclusion on principles of stare decisis.

Counsel were further advised that the scientific literature referred to in the record by both State and defense could not be *195 considered because it was not introduced into evidence and had not been identified clearly. Consequently, it was the court's opinion, to which the State objected, that the record should be supplemented with this literature as permitted by R. 3:23-8 when the record is "partially unintelligible or defective." The supplementation was not intended to permit any change in the stare decisis conclusion; it was intended to provide as full a record as possible for appellate review.
The proposed supplementation never occurred because defense counsel moved successfully for reconsideration of the stare decisis conclusion. The briefs and arguments presented have convinced me that my prior conclusion was erroneous.
Johnson and Romano stand for the proposition that the breathalyzer machine is scientifically reliable. They did not address the scientific evidence presented here or any questions relating to adjustments of breathalyzer readings. It is certain that they did not make breathalyzer readings non-rebuttable evidence of blood-alcohol content. Tischio simply eliminated the common practice of presenting scientific extrapolation opinion evidence relating to blood-alcohol content at the time of driving. It did not decide and did not have before it the question of whether scientific or other evidence could be produced to show that breathalyzer readings were not accurate. It did not create a conclusive presumption of guilt based upon a breathalyzer reading; it could not have done so because non-rebuttable criminal presumptions are unconstitutional. County Court of Ulster County, New York v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979); Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); State v. Humphreys, 54 N.J. 406 (1969); State v. Ingenito, 87 N.J. 204 (1981); Evid. R. 13, 14, 15.
Our Appellate Division in State v. Ghegan, 213 N.J. Super. 383 (App.Div. 1986), permitted a challenge to a breathalyzer reading, thus distinguishing the reading from the machine itself. In doing so it explained State v. Kreyer, 201 N.J. Super. *196 202 (App.Div. 1985), which could have been read as mandating a conviction if the test result exceeded .10%. The Ghegan court reversed a conviction based on the lower court's belief that a.10% or greater reading required that result. It held that the lower court, in deciding upon guilt or innocence, should have considered not only the test result but also a video tape of the defendant's physical performance and opinion testimony based on the tape. The breathalyzer reading was .25%; the expert was of the opinion that it could not have been more than .05%. The Appellate Division said:

Kreyer does not mandate that a .10% blood alcohol reading is irrebuttable. Rather, Kreyer should be limited to its holding that a .10% reading is sufficient to prove a violation of N.J.S.A. 39:4-50 prima facie. ... [213 N.J. Super. at 384-385]
In State v. Dohme, 223 N.J. Super. 485 (App.Div. 1988), the Court held that breathalyzer test results were inadmissible unless the State proved that the ampoules used in the machine had been subjected to random testing. Thus, a challenge to a component of the machine was permitted. The Appellate Division relied upon Romano in reaching its conclusion. Id. 223 N.J. Super. at 489.
Romano required the State to show that the breathalyzer was not subject to error resulting from radio frequency interference. This is no different than requiring the State to show that the breathalyzer is not subject to error resulting from a difference in the blood-breath ratio of the person tested and the ratio for which the machine is programmed  2100/1.
The present arguments challenge the components of the machine when they concern its 2100/1 blood-breath ratio setting and machine temperature; they challenge the administration of the test when they concern differences in the blood-breath ratios, the body temperatures and the hematocrit levels of persons tested. Both challenges are permissible under the rules laid down in Johnson, Romano, Tischio, Ghegan and Dohme.
*197 These cases are binding on this court. Consequently, while the breathalyzer is a scientifically reliable instrument, as conceded by the defendants, its test results are admissible only if the test was properly administered and the machine itself is in working order. The condition of the various components of the instrument and the results themselves are subject to challenge on the basis of facts, including scientific facts, presented by defendants.
The scientific evidence introduced here is evidence which was not available to the Supreme Court when it reached its conclusions in prior cases. That evidence is new and substantial. As a result, the principle of stare decisis does not apply. As stated in 20 Am.Jur.2d Courts, Section 191:
Where the facts are essentially different, stare decisis does not apply, for a perfectly sound principle as applied to one set of facts might be entirely inappropriate when a factual variance is introduced.
Trial courts in two foreign jurisdictions have followed this rule. See People v. Rodriquez, 101 Misc.2d 536, 424 N.Y.S.2d 600 (Sup.Ct. 1979); Kelley v. Hallden, 51 Mich. App. 176, 214 N.W.2d 856 (Ct.App. 1974).
The scientific evidence presented is "essentially different." It consists not only of the opinions of experts based upon their own experiences but also upon substantial scientific research by others to which the record refers. Particular emphasis is placed upon the work of Dr. Kurt Dubowski, a leader in the breathalyzer field who is recognized as such by all experts who testified. He supports the theory upon which the defendants rely. Further evidence of the significance and acceptability of the defense theory is found in State of Nebraska v. Burling, 400 N.W.2d 872, 224 Neb. 725 (Sup.Ct. 1987). In that case, the Nebraska Supreme Court, relying on the same scientific principles advanced by the defendants in this case, held that the breathalyzer ("intoxilyzer" in Nebraska) result must be reduced to 52.38% of that result, a figure which would be accurate for a person having a blood-breath ratio of 1100/1.
*198 The principal scientific argument advanced by the defendants is based upon differences in the blood-breath ratios of different individuals. The breathalyzer design is based upon a fixed ratio of 2100/1 while individual ratios range between 1100/1 and 3200/1. The test result obtained from an individual having a blood-breath ratio substantially more or less than 2100/1 will be substantially erroneous. Additional scientific evidence points to other potential errors in breathalyzer readings caused by blood and temperature variations in the human body and variations in the breathalyzer itself. This evidence, contained in the opinions of the experts who testified in three of the four cases, must be considered in deciding upon the guilt or innocence of all four defendants in the cases before the court.
The prosecutor argues that the burden is upon the defendants to show not only that their blood-breath ratios are not 2100/1, but also that they are sufficiently different to require an adjustment of the test results that reduces them below .10%. He relies upon People v. Pritchard, 162 Cal. App.3d Supp. 13, 209 Cal. Rptr. 314 (1984) and People v. Gineris, 162 Cal. App.3d Supp. 18, 209 Cal. Rptr. 317 (1984). The California rule, however, does not apply; in New Jersey the burden of proof is on the State. For example, the Romano Court said:
We hold further that the responsibility for establishing all conditions as to the admissibility of the breathalyzer results is properly allocated to the State. This is the rule with respect to the usual conditions of admissibility under Johnson. If the breathalyzer readings are obtained by an instrument exhibiting the possibility of interference from radio frequency waves, proof of the additional conditions negating the possibility of radio frequency interference, as delineated in our opinion and order, must be produced and shouldered by the State. [96 N.J. at 91]
Romano held that the standard of proof to be met by the State for test admissibility purposes is "clear and convincing proof". Id. at 90. It also held:
The conditions of admissibility to which this burden of proof shall apply include those presently required to establish the admissibility of the results of the breathalyzer test, namely, the proper operating condition of the machine, the requisite qualification of the operator, and the proper administration of the test. They shall also include, with respect to 900A, those conditions we have now *199 prescribed relating to the possible effects of rfi [radio frequency interference]. [Id. at 90-91]
Were the burden placed upon the defendant it could never be discharged. Both State and defense experts agree that the blood-breath ratio of every individual changes from time to time. It cannot be established in connection with a breathalyzer test, therefore, unless the breath test and the blood test are performed simultaneously. That is not possible in view of present New Jersey DWI procedures.
Romano held that "the responsibility for establishing all conditions as to the admissibility of the breathalyzer results is properly allocated to the State...." Id. at 91. Since the results would be incorrect if a defendant's blood-breath ratio was not 2100/1 and the burden is on the State to show otherwise, the results cannot be admitted into evidence unless the State carries that burden. The alternative is to admit the results and reduce them on the basis of the potential ratio difference, .055% according to Dobrowski or 52.38% of the results according to the Supreme Court of Nebraska. The same rules apply to proof of machine temperature, body temperature and hematocrit level. That conclusion does not condemn the breathalyzer as scientifically unreliable. The contrary is true. The results of the breathalyzer tests, however, are not reliable without proof by the State that the machine was working properly and that the test was administered properly.
This court, after agreeing to reconsider its preliminary opinion, suggested that counsel supplement the record with the literature upon which both State and defendants rely and with additional expert testimony from both sides. Three of the four defendants agreed. The prosecutor did not. Supplementation without the State's consent is inappropriate. The four appeals are therefore decided on the basis of the records below.

*200 A. State v. McGinley

McGinley was charged with speeding and DWI. He was given certain field tests not considered in this opinion and two breathalyzer tests resulting in readings of .13 and .12. These tests were challenged on the basis of scientific opinion evidence. The State did not present any scientific evidence in response. McGinley was permitted to participate in the other three appeals on an amicus basis. Later, after completion of his trial, he filed an interlocutory appeal to establish the obligation of the municipal court to consider the opinion evidence.
The defense premise is that the breathalyzer is designed to accommodate a 2100/1 blood-breath ratio for every person tested. In fact, individual blood-breath ratios vary from 1100/1 to 3200/1; 2100/1 is an average. The setting of the machine at 2100/1 results in an erroneously high breathalyzer reading in 14% of the population; it produces a low reading for the other 86%. In the case of an individual whose breathalyzer test result is.14 and who has a blood-breath ratio of 1100/1, a correct reading would be .075. Professor Stanley J. Broskey was the defense expert. He was shown to be well qualified to give an opinion on the subject, having been involved with breathalyzers for 20 years. He was a forensic chemist toxicologist with the New Jersey State Police for 3 years and has been exposed to breathalyzer practices in 40 of the 50 states. He has performed approximately 1600 simultaneous breath to blood tests. He supported the defense blood-breath ratio arguments on the basis of his own experience, his own education and the scientific literature in the field. Particular reliance was placed upon Dr. Kurt Dubowski, a recognized leader in the field. Dr. Dubowski is of the opinion that a breathalyzer reading must be reduced by .03% by reason of inherent error in the machine itself and by an additional .025% by reason of errors which occur when a breath reading is translated to a blood reading. Thus, according to Dr. Dubowski, every breathalyzer reading should be reduced by .055%.
*201 In 1980 the Alaska drunk driving statute, which relied on breathalyzer tests, was challenged on the ground that the tests were not accurate. Dr. Dubowski appeared as an expert witness. Erwin, Defense of Drunk Driving Cases Sec. 18.01 (3d ed. 1986), discusses the Alaskan litigation and has the following to say about Dr. Dubowski:
Dr. Kurt Dubowski of the University of Oklahoma, probably the foremost researcher in the field, was brought to Anchorage to testify as an expert witness. In 1970-71 he had been chairman of the National Safety Council's Committee on Alcohol and Drugs. In 1978-79 he was president of the American Academy of Forensic Sciences. At the University of Oklahoma School of Medicine he was awarded federal funding that enabled him to use the latest instrumentation to check the previously accepted theories relating to blood and breath alcohol. Without a doubt he is the most knowledgeable scientist in his field at the present time. [at 18-14]
Professor Broskey testified that Dr. Dubowski "is recognized as the most prestigious member in the scientific community as far as blood and breath in America" and was the coordinator of the breath testing program of the State of Oklahoma.
Erwin further states:
A study of the evidence submitted to the [Alaska] court would lead to the inescapable conclusion that the breathalyzer test, and no breath test for that matter, could accurately reflect breath alcohol levels for all subjects at the time a test is administered. That while such tests may be reasonably accurate, they are not sufficiently precise to support a finding of guilty in a close case, where the question of guilt or innocence depends entirely on the blood alcohol level. [Id.]
Erwin quotes a partial summary of the Dubowski testimony prepared by the Alaska Public Defender as follows:
To prevent such over reporting [of high breathalyzer readings in 14% of the population] in 997 of 1000 cases, it would be necessary to subtract.025 from the raw breathalyzer test result. Dubowski indicated this subtraction would be in addition to the .03 subtraction required as a result of the margin of error inherent in the machine.... [Id. at 18-14.2]
Professor Broskey testified that he had done simultaneous blood to breath tests in approximately 1600 court cases with findings that supported the 1100 to 3200 difference in blood-breath ratios. These ratios, he said, change from day to day in the same person. He noted other causes of erroneous breathalyzer test readings, namely, changes in body temperature, *202 changes in the temperature of the machine itself, a difference between male and female subjects, hemotocrit levels and bad health.
Trooper Amburgey, a state police expert, testified generally as to the testing and operation of breathalyzer machines but did not testify in opposition to the opinions of Professor Broskey. He admitted that Dr. Dubowski was probably one of the foremost experts in blood to breath and breathalyzer operations in the United States. He had been trained by Dr. Dubowski as had other members of the New Jersey State Police. He agreed that the breathalyzer could produce a "higher reading if the machine itself was running hotter than 54 or 55 degrees centigrade."
Some states follow procedures to safeguard the accuracy of breathalyzer readings. For example, simulator tests which check machine fluctuations may be performed before and after each individual test. Trooper Amburgey agreed that some states used this procedure but could not name them. Oklahoma captures a breath sample during each test and subjects it to a laboratory analysis to confirm the test result. New Jersey undertakes simulator tests monthly and makes no confirmatory analysis of breath samples.
Professor Broskey was of the opinion that McGinley's breathalyzer readings were substantially less than the .13 and.12 reported. The question here, however, is not whether McGinley should be acquitted of DWI by reason of Professor Broskey's testimony but whether that testimony is to be considered by the municipal court judge. McGinley's interlocutory appeal was taken for the purpose of having that question answered. It is clear from the framework opinion above and from the specific proofs presented at the McGinley trial that the Broskey testimony must be considered. This matter is therefore remanded to the municipal court for that purpose.

*203 B. State v. Desterre

Two questions must be resolved in connection with this municipal appeal: (1) Does the scientific evidence presented require the modification or exclusion of the breathalyzer test results? (2) Are the field tests performed by the defendant sufficient to require a finding of guilty?
The defendant, James Desterre, was stopped by a police officer who observed his car weaving when turning a corner. The officer smelled alcohol on his breath and inquired about his drinking. Desterre admitted having a "couple of beers." He was given field tests (discussed below) and arrested and charged with violation of N.J.S.A. 39:4-50 (DWI). He was given a breathalyzer test which produced readings of .13% and .14%.
The defense expert, Professor Broskey, relying on his own experience and on scientific literature including that of Dr. Kurt Dubowski, testified that the breathalyzer machine relies on an average blood-breath ratio of 2100/1 in reaching its test results. He said that this ratio was wrong, that 2280/1 would be better. The actual range in the population at large is from 1117/1 to 3240/1, rounded to 1100/1 to 3200/1. In the case of an individual with an 1100/1 ratio, a .14% breathalyzer reading would have to be adjusted to .075% to be accurate. A 1500/1 ratio would require a .13% reading to be reduced to .092%.
Professor Broskey pointed out that blood-breath ratios change daily in the same person and that an accurate analysis of blood alcohol content measured by a breath test would require a simultaneous sampling of blood. He noted that the breathalyzer machine cannot be adjusted to allow for different ratios.
Professor Broskey also said that body temperature differs from person to person and affects breathalyzer readings. For example, a temperature of 100 degrees instead of 98.6 degrees produces a breathalyzer reading that is .01% higher than it should be. In addition the temperature of the breathalyzer *204 machine itself can cause a .02% variation in the reading. Finally, he said that hemoglobin content varies in individuals from 42% to 54% and, toward the upper end of that variation, can cause a breathalyzer reading error of 7 to 10 percent.
Dr. Tindall, the State's expert, relied primarily on the scientific literature in the field; he recognized Dr. Dubowski as an expert and agreed with the ratio figures and calculations presented by Professor Broskey. It was his opinion, however, that 99.9% of the population had a blood-breath ratio of 1550/1 or above. Nevertheless, he said that 86% of the population receive a low breathalyzer reading when tested by a machine designed for a 2100/1 blood-breath ratio, 14% a high breathalyzer reading. Dr. Tindall said he had never seen a blood test result which was lower than a breathalyzer test result, but admitted that he had done no significant blood to breath ratio testing. He claimed that the ratio differences were based upon an irrelevant population, namely college students and volunteers, not drunk drivers. He admitted that drunk drivers as a group were not representative of the general population. He had neither performed or supervised any blood-breath tests performed on the population at large. He could not make the calculation required to connect different blood-breath ratios with test results until after a 12 day recess of the municipal court trial.
Dr. Tindall did not disagree with Professor Broskey in any important respect except to argue that nearly everyone has a blood-breath ratio of at least 1550/1. (Professor Broskey referred to a British test of only 5 persons which found that one person in five had a ratio of 1100/1.) He was critical of some of the literature. He admitted that 14% of the population, as a result of blood-breath ratio differences, received erroneously high breathalyzer test results. He also agreed that a person having a .13% breathalyzer reading and a blood-breath ratio of 1600/1 would have a correct breathalyzer reading of .099%. The same persons with a ratio of 1700/1 would have a correct reading of .105. These are significant differences and involve *205 persons in the 99.9% classification asserted by Dr. Tindall. He said that the blood-breath ratio changes with different blood alcohol concentrations, thus adding another variant. He acknowledged (without accepting) Dr. Dubowski's opinion that breathalyzer readings, in order to compensate for errors, should be reduced by .055%. He said: "The only way one can know precisely what somebody's blood alcohol is is to analyze their blood."
A reading of all of the expert testimony compels the conclusion that Professor Broskey was more convincing than Dr. Tindall. They agreed on many essentials including the fact that breathalyzer results are subject to significant errors. They agreed upon Dr. Dubowski's expertise and the State did not effectively explain away his .055% conclusion. Perhaps it could have done so had it accepted the offer to present additional evidence. Its refusal to do so, however, leads to an opposite inference. The weight of the scientific evidence favors the defendant. The fact that 14% of the population, according to both experts, receive a high reading when tested by the breathalyzer is an unacceptable circumstance.
The State failed to prove Desterre's blood-breath ratio by clear and convincing evidence. In fact, it failed to present any proof of that ratio, or of machine temperature, or body temperature or hemoglobin content. The breathalyzer tests are therefore inadmissible or must be reduced to a point below .10%.
The defendant also argues that the State failed to produce any evidence of the random testing of the ampoules used in the breathalyzer machine. That this is required is clear from State v. Dohme, 223 N.J. Super. 485 (App.Div. 1988). This is a further reason which requires the exclusion of the breathalyzer test results.
The final question to be answered here is whether the field tests described by the arresting officer and later video-taped require a conviction. The officer described Desterre's condition at the arrest scene, the odor of alcohol on his breath, *206 his transposition of letters when reciting the alphabet, his swaying in the course of two bending tests and his correct completion of a heel to toe line walking test. Desterre was tested again at police headquarters less than 49 minutes later. These tests were videotaped and have been viewed by the court. They reflect a near perfect performance. It makes no sense to conclude that Desterre became sober enough to pass the tests in 49 minutes. The videotape contradicts the evidence of the initial field tests.
It is a necessary conclusion that the State has not proved its charge beyond a reasonable doubt. The court below erroneously considered the breathalyzer results. It should have found that the difference between the field and video tests created a reasonable doubt as to Desterre's guilt. Desterre is not guilty.

C. State v. Shull

The expert testimony in this matter is not essentially different than that presented in State v. Desterre. The analysis made in the Desterre case applies here as well and will not be repeated. The same conclusion applies. The breathalyzer test results in Shull's case must be excluded or reduced to a point well below the .10% threshold. The court below erroneously considered the breathalyzer results as accurate.
The defendant admitted to drinking about 5 beers over a period of 6 or 7 hours and did not perform field tests well at the scene of the arrest. The arresting officer detected an odor of alcohol on his breath, his speech was slurred, his eyes bloodshot. He recited the alphabet correctly but lost his balance during sway and heel to toe tests. He performed the tests with perfection, however, at the police station, as shown on video. Dr. Broskey pointed out that the video performance and the .14% breathalyzer reading were not consistent and he suggested that the defendant's poor performance at the scene may have been the result of stress or fatigue. He noted that the videotape was made about 25 minutes after the arrest and *207 that the defendant could not have been more sober in that short period of time. Dr. Tindall agreed that a person with a .14% blood alcohol content would show a "much more marked deviation" than the video indicated. He nevertheless insisted that the field tests and the video were "not inconsistent". That is not a logical conclusion.
The State failed to prove beyond a reasonable doubt that the defendant was driving while intoxicated. He is not guilty.

D. State v. Fiel

This is an interlocutory appeal. The court below refused to hear defendant's offered scientific testimony of the character presented by Professor Broskey in the other cases considered here. The basic conclusions contained in this opinion apply to this case and require a reversal. The scientific evidence is admissible and must be considered in deciding whether or not the defendant is guilty as charged.