THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL GUSTAFSON, Defendant-Appellant.

Second District   No. 2—88—0994

Opinion filed March 6, 1990.—Rehearing denied April 3, 1990.

Carl M. Walsh and Martin S. Gerber, both of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Michael Gustafson, appeals from his conviction of operating a motor vehicle with a breath-alcohol concentration in excess of .10 in violation of section 11—501(a)(1) of the Illinois Vehicle Code (Code) (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(1)). Defendant raises three issues on appeal. Defendant first argues that his second trial and ultimate conviction were barred by the double jeopardy clauses contained in both the United States and Illinois Constitutions (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10). Defendant also argues that sections 11—501.2(a)(5) and 11—501(a)(1) of the Code are unconstitutional because they are based on a faulty scientific premise and therefore are not rationally related to the legislative purpose underlying the drunk-driving statutes. With regard to the latter Code section, defendant further asserts its unconstitutionality, claiming that it violates constitutional guarantees of due process and proportionality of punishment because persons who are convicted of driving with a breath-alcohol concentration of .10 are subjected to the same punishment as persons who are convicted of "driving under the influence" in violation of section 11—501(a)(2) (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(2)). Lastly, defendant argues that he was not proved guilty of driving with a breath-alcohol concentration in excess of .10 beyond a reasonable doubt. We reject defendant's constitutional challenges and affirm his conviction.

Prior to trial, defendant made a motion *in limine* to preclude the State from presenting evidence and testimony about the horizontal gaze nystagmus test. The court granted defendant's motion, and the

trial commenced on May 11, 1988. The State's first witness, Officer Kevin Sullivan, took the stand and testified to the events surrounding defendant's arrest for drunk driving on February 14, 1987. He stated that the first test he administered to defendant was the horizontal gaze nystagmus test. Defendant immediately moved for a mistrial, which the court denied; however, in chambers the court admonished the prosecutor that such testimony had already been excluded pursuant to defendant's motion *in limine* and that it was the prosecutor's responsibility to prepare his witnesses properly so as to avoid any mention of the excluded evidence. Counsel returned to the courtroom, and the trial resumed in the jury's presence as follows:

"[PROSECUTOR]: Officer, after that test was administered to the Defendant, what was the second test that you administered?

[DEFENSE COUNSEL]: I will object, Judge, and again make the same motion [for a mistrial]."

Following additional discussion in chambers, the court announced that it would grant defendant's motion for a mistrial, and the jury was discharged. Defendant's new trial commenced July 26, 1988, and the testimony presented is summarized below.

On February 14, 1987, at approximately 9:30 p.m., Officer Kevin Sullivan of the Burr Ridge police department observed defendant operating a beige Cadillac southbound on I-55. Officer Sullivan noted that the vehicle drifted from the right to the center lane and failed to signal its movement. He then pulled the car over and approached to observe defendant, who was exiting his automobile. Officer Sullivan testified that defendant stumbled and almost fell. He also observed that defendant's eyes were bloodshot, he appeared sleepy and his speech was somewhat slurred. Officer Sullivan obtained defendant's driver's license, asked him whether he had been drinking and requested him to take field sobriety tests. Defendant admitted he had had a couple beers. Officer Sullivan conducted field sobriety tests with defendant on the shoulder of the road. He testified that the area was well lit and the shoulder surface was straight and level. He stated that defendant was unable to complete the one-foot-balance test successfully and did not perform satisfactorily on the heel-to-toe walking test. Officer Sullivan admitted that defendant told him that he had metal rods in his legs. At this point, Officer Sullivan testified that he formed the opinion that defendant was under the influence of alcohol and proceeded to escort defendant to the Burr Ridge police department for a breath analysis.

Officer Sullivan testified to his training and qualification as a

breath analysis machine operator and stated that he was certified to operate the Breathalyzer 1000, the breath analysis machine on which he conducted defendant's breath test. Officer Sullivan explained each step of the testing procedure, including the operational checklist, the 20-minute observation period, the motorist's warning, etc., and testified that he followed each step. He also testified to the testing and certification of the machine and stated that the machine had been certified as accurate approximately 10 days prior to defendant's arrest. Officer Sullivan then described in minute detail the certification procedures, the prebreath analysis test warm-up procedures and the preparational steps he took to obtain an accurate test of defendant's breath. He stated that defendant's test result was .17. Sullivan charged defendant with driving under the influence of alcohol and with driving with a breath-alcohol concentration of .10 or more (Ill. Rev. Stat. 1987, ch. 95½, pars. 11—501(a)(2), (a)(1)).

On cross-examination, Officer Sullivan admitted that, prior to conducting defendant's breath analysis test, he had conducted only one previous test between November and February. He also testified to his knowledge that the Department of Public Health allowed a margin of error of .01 in its certification of breath analysis testing machines. He stated that the machine operates on the theory of photoelectric colorimetry. He testified that the test result indicates the equivalent amount of alcohol contained in defendant's blood. He further stated that to his knowledge the machine relied upon a ratio of 2,100 cubic centimeters of deep lung air to one cubic centimeter of whole blood. The witness stated that his knowledge concerning the operation of the machine came from his 40-hour instruction course in its operation.

Sergeant Albert Zellers of the Burr Ridge police department also testified for the State. He said that he arrived upon the scene of defendant's arrest and observed defendant's performance of the field sobriety tests. He corroborated Officer Sullivan's testimony in this regard and concurred in Sullivan's opinion that defendant was under the influence of alcohol.

At the close of the State's evidence, defendant presented his own testimony as well as that of Norman W. Scholes, who qualified as an expert in pharmacology. In his own behalf, defendant rebutted each of Officer Sullivan's observations concerning his personal appearance and his performance of the field sobriety tests with alternative explanations. He testified that he was a builder and carpenter by trade, and on the date of his arrest, he had put in a long work day which commenced at 7 a.m. and ended at approximately 5 p.m. Thereafter, he had pizza and two beers with co-workers and then returned to his

shop to load up a crane for the next work day. On his way home, he recalled changing lanes on I-55 because he knew his exit ramp came up quickly. Defendant testified that he was pulled over by Officer Sullivan and was asked to perform roadside tests. Defendant stated he attempted to perform the tests but had medical conditions which made such performance difficult for him. These medical conditions included metal rods and screws in his left leg and serious muscle damage in his right leg. Defendant stated that he told Officer Sullivan about these conditions.

Defendant also testified that he wears contact lenses and, after a full day of wearing them, his eyes were irritated and bloodshot. Defendant stated that he was not under the influence of alcohol at the time he was driving his car on I-55.

Defendant's expert, Norman Scholes, presented lengthy and detailed testimony concerning his qualifications as an expert in the areas of pharmacology and the effect of toxic chemicals, including alcohol, on human beings. He testified to his familiarity with various breath analysis machines and the technology and theory underlying their operation. He admitted that he had no personal experience with the Breathalyzer 1000. Scholes stated that breath analysis machines do not measure blood alcohol in humans; rather, such machines measure breath alcohol only. Scholes further stated that breath alcohol does not indicate an individual's intoxication or impairment due to alcohol.

Scholes described the absorption of alcohol in an individual from the stomach and small intestines to the bloodstream and ultimately to the brain cells, where the alcohol acts as an anesthetizing agent. He stated that the greater the concentration of alcohol in the brain cells, the greater the anesthetic level. He then went on to describe the manner in which a human body metabolizes alcohol. According to Scholes, breath analyzing machines throughout the United States operate on a presumption that alcohol in a human being is distributed between liquid (blood) and air (breath) at a given rate. He testified that the ratio of this distribution was determined by forensic toxicologists and scientists at a conference in 1956. He stated that the ratio selected was 2,100:1. This ratio is variously called the distribution ratio, the partition ratio or the coefficient of partition. Scholes opined that the 2,100:1 ratio was no longer considered a valid average for the human population.

Scholes testified to his knowledge and review of various recent studies in current scientific literature which indicate that an appropriate average distribution ratio for human beings is perhaps closer to

2,400:1. He also stated that the studies and literature with which he was familiar indicated that human beings have a range of distribution ratios which vary as widely as 1,100:1 to 3,400:1. He testified that the ratio 2,100:1, relied upon by all breath analysis machines to equate an individual's breath-alcohol concentration to his blood-alcohol concentration, would lead to readings too high for approximately 8% of the population. He further opined that because breath analysis machines rely on a ratio which does not take into account the variability of the human population, a machine could render a test result up to 53% in error.

The State rebutted Scholes' expert testimony with the testimony of Daniel J. Brown, then the chief forensic toxicologist for the State of Illinois. Like Scholes, Brown testified to his educational background, his familiarity with breath analysis machines and their underlying theory, and his familiarity and knowledge of scientific studies and literature concerning the distribution ratio of breath-alcohol concentration to blood-alcohol concentration in human beings. He refuted Scholes' opinion that the 2,100:1 distribution ratio relied upon currently is an inaccurate figure as it relates to the general population. He admitted, however, that the ratio was very much dependent on body temperature and that current scientific literature indicated that the more accurate ratio was probably closer to 2,300:1 or 2,400:1. He pointed out that the ratio 2,100:1, because it is apparently somewhat low, generally provides slightly low readings in terms of a test subject's true blood-alcohol concentration, thus giving the subject "the benefit of the doubt."

Brown stated that he had actual hands-on experience with the Breathalyzer 1000 and refuted Scholes' opinion that it and all breath analysis machines were unreliable. He opined that there was a high degree of correlation between the actual result of breath analysis and subsequent blood analysis in test subjects. Brown stated that he believed the 2,100:1 ratio was applicable to at least 95% of the population.

Both experts testified to their knowledge and familiarity with the studies published by Dr. Kurt Dubowski, and both recognized Dr. Dubowski as a leading authority in the field of breath analysis in the United States. They further testified to various aspects of Dr. Dubowski's studies and gave their own versions of Dr. Dubowski's opinions concerning the scientific validity of extrapolating blood-alcohol concentration in individuals from their breath-alcohol concentrations and the applicability of the distribution ratio of 2,100:1 to the human population.

Following the close of evidence and the reading of instructions, the jury found defendant not guilty of driving under the influence of alcohol in violation of section 11—501(a)(2) but found defendant guilty of operating a motor vehicle with a breath-alcohol concentration of .10 or more in violation of section 11—501(a)(1) of the Code. Defendant's timely appeal ensued.

The issues presented on appeal are: (1) whether the retrial of defendant was barred by double jeopardy; (2) whether section 11—501.2(a)(5) of the Illinois Vehicle Code is unconstitutional because it is not rationally related to a legislative purpose; (3) whether section 11—501(a)(1) of the Code is unconstitutional because it lacks a similar rational relationship to a legislative purpose and further violates constitutional guarantees of due process and proportionality of punishment; and (4) whether defendant was proved guilty of operating a motor vehicle with a breath-alcohol concentration of .10 or more beyond a reasonable doubt.

### A. DOUBLE JEOPARDY

Defendant asserts that the prosecutor's second reference to the horizontal gaze nystagmus test, despite the trial court's clear admonition to the contrary, was intended to goad defendant into moving for a mistrial. Thus, defendant concludes that the prosecutor's actions constituted deliberate prosecutorial overreaching and double jeopardy barred a second trial. Generally, a defendant's motion for a mistrial obviates the application of double jeopardy and entitles the State to retry a defendant even though the basis for the mistrial is an error attributable to the State. (See *People v. Williams* (1984), 130 Ill. App. 3d 11, 14-15, citing *Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083.) In *Kennedy*, the United States Supreme Court stated:

> "[W]e do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679, 72 L. Ed. 2d at 427, 102 S. Ct. at 2091.

Although we do not condone the prosecutor's failure to prepare his witness properly so as to avoid any mention of the excluded evidence, we do not believe his actions were intended to goad defendant into moving for a mistrial. To the contrary, the prosecutor's actions appear to be the result of simple inadvertence. We hold that

defendant's retrial was not barred by double jeopardy.

## B. CONSTITUTIONALITY OF SECTION 11—501.2(a)(5) OF THE CODE

Secondly, defendant contends that there is no rational basis for the definition of breath-alcohol concentration as provided in section 11—501.2(a)(5) of the Code, thus making that provision unconstitutional and the results of the breath test inadmissible.

■ Defendant correctly identifies the constitutional standard applicable to his challenge: statutes not involving fundamental rights will pass constitutional muster if they bear a rational relationship to a legitimate legislative purpose and are neither arbitrary nor discriminatory. (*People v. Kohrig* (1986), 113 Ill. 2d 384, 397; see also *Illinois Norml, Inc. v. Scott* (1978), 66 Ill. App. 3d 633, 639.) Further, it is well established that legislative enactments enjoy a strong presumption of constitutionality, and the burden of establishing their irrationality lies squarely on the challenger. *People v. Orth* (1988), 124 Ill. 2d 326, 334; *People v. Inghram* (1987), 118 Ill. 2d 140, 146.

■■ ■ The legislative purpose underlying the entire drunk-driving statutory scheme is the promotion of highway safety (see *People v. Eckhardt* (1989), 127 Ill. 2d 146, 152 (the purpose underlying the statutory definition of "first offender" and the related sentencing statute)), and the specific purpose behind section 11—501(a)(1) and the definitional section, section 11—501.2(a)(5), is the imposition of strict liability on motorists impaired by alcohol concentrations of .10 or more (*People v. Ziltz* (1983), 98 Ill. 2d 38, 42). In *Ziltz*, our supreme court stated that the legislature has determined that an alcohol concentration of .10 constitutes driver impairment, and thus the court concluded that the statute was a rational means to achieve a permissible legislative purpose: curbing the incidence of drunk drivers on Illinois' highways. *Ziltz*, 98 Ill. 2d at 43.

The appellate court has previously held section 11—501.2(a)(5) to be constitutional in *People v. Capporelli* (1986), 148 Ill. App. 3d 1048. Section 11—501.2(a)(5) provides "[a]lcohol concentration shall mean either grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2(a)(5).) This definition is incorporated by reference in section 11—501(a)(1), which makes it an offense for an individual to drive or be in physical control of a motor vehicle while the individual's blood- or breath-alcohol concentration is .10 or more. The *Capporelli* court noted that the alcohol partition ratio between deep lung air and blood, while the subject of some scientific debate, has been accepted by the Illinois legislature at a value of 2,100:1. Without discussion, the court

indicated that the ratio enjoyed substantial support in the scientific community and provided a rational basis for the statute, even though scientific support was not unanimous. (*Capporelli*, 148 Ill. App. 3d at 1054-55.) Thus, the court held section 11—501.2(a)(5) to be constitutional. 148 Ill. App. 3d at 1055.

Defendant challenges this legislative assumption in his appeal. He presented lengthy and detailed expert testimony concerning the alleged flaws in the 2,100:1 ratio and cited extensive case authority from other jurisdictions to support his expert's conclusion that because the 2,100:1 ratio is inaccurate, it does not provide a reliable means of determining an individual's impairment from alcohol. In none of the cases cited by defendant did the court determine the constitutionality of a drunk-driving statute. Rather, the court in each case was concerned with the admissibility and applicability of expert testimony concerning the variability of the partition ratio in the human population and the part such testimony should play in the prosecution of drunk-driving cases.

In *People v. McDonald* (1988), 206 Cal. App. 3d 877, 254 Cal. Rptr. 384, the California appellate court held that to instruct a jury that a defendant is presumed to have a distribution ratio of 2,100:1, unless he himself can establish otherwise, is error. The basis for the court's ruling was twofold: first, the exonerating fact (the defendant's own partition ratio) was not peculiarly within his knowledge; and, second, the effect of the instruction was to nullify impermissibly the defendant's expert testimony. The court explained:

> "The fact presumed by the instruction—constancy of one's partition ratio—was in doubt. The resolution of that doubt was a factual question for the jury. Yet the court's instruction effectively took the question from the jury and cast in stone a fact not proven." (*McDonald*, 206 Cal. App. 3d at 844, 254 Cal. Rptr. at 389.)

The California appellate court essentially affirmed the *McDonald* holding in *People v. Lepine* (1989), 215 Cal. App. 3d 91, 263 Cal. Rptr. 543, in which the court noted that the dispute concerning the breath-alcohol to blood-alcohol partition ratio was not unique to California and cited several recent cases from six other jurisdictions, noting:

> "These courts have uniformly accepted the fact of partition ratio variability and have almost uniformly concluded the fact of variability goes to the weight to be given breath test evidence rather than its admissibility." (*Lepine*, 215 Cal. App. 3d at ____, 263 Cal. Rptr. at 548.)

(See also *People v. Reding* (1989), 191 Ill. App. 3d 424, 436-37.) The

*Lepine* court thus declined to "arbitrate scientific disputes" and held that juries must be allowed to consider the question of individual humans' partition ratios. 215 Cal. App. 3d at ____, 263 Cal. Rptr. at 549.

The Nebraska Supreme Court faced a similar question in *State v. Burling* (1987), 224 Neb. 725, 400 N.W.2d 872. Nebraska's drunk-driving statute, similar to the Illinois statute, prohibits actual physical control of a motor vehicle while under the influence of alcohol or when one has 10/100 of one gram or more by weight of alcohol in one milliliter of one's blood or urine, or 210 liters of one's breath. (Neb. Rev. Stat. §§39—669.07 (1) through (4) (1988).) The defendant was convicted of driving under the influence and appealed on the ground that the breath test results should not have been considered by the trial court because such tests do not reliably measure blood-alcohol levels. The defendant presented expert testimony regarding the mechanism, operation and accuracy of the Intoxilyzer Model 4011AS. His expert opined that the machine did not reliably measure blood-alcohol level because its built-in ratio (2,100:1) had been abandoned by forensic toxicologists. The expert also indicated that many other factors can affect such a machine's ability to function. The State offered no contradictory evidence.

The *Burling* court concluded that the breath-test result was admissible but subject to a margin of error of approximately 53%; the court further determined that the defendant was entitled to the benefit of the margin of error, and thus his breath-test result of .164 had to be reduced by approximately 53%. When reduced, the test result plainly failed to prove the defendant had operated an automobile when he had 10/100 of 1% of alcohol in his body fluids as measured by analysis of his breath. (*Burling*, 224 Neb. at 730-31, 400 N.W.2d at 877.) However, as the State correctly points out, *Burling* was later limited to its facts by *State v. Babcock* (1988), 227 Neb. 649, 419 N.W.2d 527, in which the Nebraska Supreme Court declared that breath-test results are not to be adjusted automatically as a matter of law. It stated, "[w]hether an adjustment is required is dependent upon the credible evidence in each case." *Babcock*, 227 Neb. at 653, 419 N.W.2d at 530.

In *State v. McGinley* (1988), 229 N.J. Super. 191, 550 A.2d 1305, a New Jersey law division court considered whether a defendant may challenge breath-test results on the basis of scientific opinion which concludes such tests are subject to up to 50% error. This case involved the consolidation of several appeals. In one, the court concluded that the trial court should have considered expert testimony

concerning the accuracy of breath testing to establish an individual's blood-alcohol level and returned the cause to the trial court for such determination. However, in two other appeals, the court reversed outright two guilty verdicts because the State failed to provide any evidence of the defendants' blood-to-breath ratios, among other things, so the test results should have been excluded altogether or reduced by a margin of error. McGinley, 229 N.J. Super. at 206, 550 A.2d at 1312-13.

As the State correctly observes, *McGinley* was expressly overruled two months later on procedural grounds by *State v. Downie* (1988), 229 N.J. Super. 207, 550 A.2d 1313, in which the appellate division rejected a similar challenge on the ground that the New Jersey Supreme Court had previously declared that all New Jersey courts were to take judicial notice of the scientific reliability of breath analysis machines. Thus lower courts had no authority to allow a challenge to the machines' reliability. (*Downie*, 229 N.J. Super. at 210-11, 550 A.2d at 1315, citing *Romano v. Kimmelman* (1984), 96 N.J. 66, 72, 474 A.2d 1, 4.) The appellate court did, however, take the merits of the *McGinley* challenge seriously and urged the New Jersey Supreme Court to consider the matter immediately. *Downie* is currently on appeal. See *State v. Downie* (1989), 114 N.J. 498, 555 A.2d 618.

In our research, we have uncovered *State v. Brayman* (1988), 110 Wash. 2d 183, 751 P.2d 294, in which the Washington Supreme Court considered the constitutionality of a *per se* drunk-driving statute similar to the Illinois statutes. Applying the rational basis test, the court held the statute constitutional. It stated:

> "Here, the parties do not dispute that the purpose of the 1986 amendments is to reduce the drunk-driver hazard on the public highways. [Citations.] Respondents contend, however, that the chosen means of furthering this goal—breath alcohol content—is too indirectly related to impairment to justify the statute. Respondents argue that the State has not established any evidence that directly links breath alcohol to impairment. \*\*\*
>
> \* \* \*
>
> \*\*\* While the record may establish that breath is a less direct measure of blood alcohol levels, it does not establish a lack of a reasonable and substantial relationship between breath alcohol and impairment. We conclude that the 1986 amendments are a valid exercise of police power." *Brayman,* 110 Wash. 2d at 193-95, 751 P.2d at 300-01.

It is clear that scientific debate on the ratio between breath-alco-

hol concentration and blood-alcohol concentration in human beings will continue and probably intensify as more States adopt *per se* statutes to curb drunk driving (see Annot., 54 A.L.R.4th 149 (1987)), and drunk-driving defendants attempt to convince juries of the fallibility of the breath-testing machine. However, it is not this court's function to rewrite the statute. If some of the experts are correct that breath analysis is nothing more than a crude and imprecise measure of an individual's blood-alcohol level, which is itself an indirect indicator of a person's impairment due to alcohol, it would appear that breath analysis does little to promote highway safety. In fact, in the instant cause, the State concedes that the 2,100:1 ratio built into every breath analysis machine is somewhat low and benefits drunk-driving defendants. Some persons, those with individual partition ratios exceeding 2,100:1, will not be charged with the *per se* drunk-driving offense because they will not produce the requisite breath-test result even though they may have a blood concentration of .10 or more had it been checked. In short, the *per se* statute subjects motorists with low individual partition ratios to drunk-driving penalties while allowing impaired motorists with high individual partition ratios to go free. Nevertheless, whether the legislature's chosen course is wise or the best method to achieve the underlying purpose of highway safety is not a proper subject for judicial inquiry. (*People v. Inghram* (1987), 118 Ill. 2d 140, 150.) Whether the measures adopted by the legislature actually further highway safety is an appropriate topic for legislative discussion and not for the courts (*People v. Kohrig* (1986), 113 Ill. 2d 384, 397); our only function in this debate is to determine the constitutionality of the challenged statutes (*People v. J.S.* (1984), 103 Ill. 2d 395, 407).

Although defendant contends that breath-analysis machines are based on a faulty premise, the 2,100:1 ratio, and therefore do not provide reliable indications of motorists' blood-alcohol levels, it would appear that "[t]he consensus of leading researchers is that 86-95% of the entire population are reliably within that ratio" (*People v. Nieves* (1989), 143 Misc. 2d 734, ___, 541 N.Y.S.2d 1008, 1011). Because there appears to be substantial scientific evidence to support the usefulness of the 2,100:1 ratio embodied in the challenged statutory sections, we conclude that the sections are reasonably related to their underlying purpose of reducing drunk driving and thus are constitutional. *People v. Capporelli* (1986), 148 Ill. App. 3d 1048, 1054-55; *State v. Brayman* (1988), 110 Wash. 2d 183, 195-96, 751 P.2d 294, 301.

## C. CONSTITUTIONALITY OF SECTION 11—501(a)(2)

■ Defendant next contends that "to subject [a] defendant [whose] breath alcohol concentration exceeds 0.10, to the same penalties as one who has proved to be actually impaired by alcohol is a denial of due process and a violation of the constitutional assurance of proportionate penalties." Our supreme court has already addressed this point rather succinctly in *People v. Ziltz* (1983), 98 Ill. 2d 38, where it stated:

> "The legislature has made the determination that driving with an alcohol concentrate of 0.10 or above *does constitute impairment*. The State has a rational basis for curbing the incidence of drunk driving, and the Illinois statute is a reasonable means of promoting that interest." (Emphasis added.) (*Ziltz*, 98 Ill. 2d at 43.)

In short, a defendant whose breath-alcohol concentration exceeds .10 is "actually impaired by alcohol" by definition. The justification of defendant's contention is primarily a rehash of his earlier arguments concerning the unreliability and inaccuracy of breath-analysis test results. In view of our foregoing conclusions, we reject defendant's constitutional challenge and hold that section 11—501(a) of the Code does not operate as a denial of due process, nor does it violate the constitutional assurance of proportionate penalties.

## D. DEFENDANT WAS PROVED GUILTY BEYOND A REASONABLE DOUBT

■ Defendant's final contention is his assertion that the breath-test result, subject as it is to a wide margin for error, does not provide proof that he had a breath-alcohol concentration in excess of .10. This argument presumes the truth of the scientific testimony presented by defendant which the jury apparently rejected. We will not substitute our judgment on this issue for that of the fact finder; thus, we reject defendant's final appellate contention.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

REINHARD and McLAREN, JJ., concur.