Steven C. MEYER, Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. ED 77411.

Missouri Court of Appeals,
Eastern District,
Division One.

Dec. 5, 2000.

Jeremiah W. (Jay) Nixon, Attorney General, Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for appellant.

Steven P. Kuenzel, Eckelkamp, Eckelkamp, Wood & Kuenzel, Washington, MO, for respondent.

TEITELMAN, Judge.

The Director of Revenue (Director) suspended the driving privileges of Steven C. Meyer[1] (Driver) following his arrest for driving while intoxicated. Director appeals the circuit court's judgment, after a trial de novo, setting aside Director's suspension of Driver's privileges. On appeal Director argues that as a matter of law Driver's evidence was insufficient to rebut Director's prima facie case. We reverse and remand.

## FACTS

At 12:57 a.m. on March 9, 1999, a Missouri State Highway Patrol officer stopped Driver's vehicle on Missouri Route 100 for driving over the centerline. When Driver got out of his vehicle and moved toward the officer's vehicle, he swayed unsteadily as he walked and had an odor of alcohol on his breath. After Driver failed several field sobriety tests the officer arrested him for driving while intoxicated and transported him to the police station in Hermann, Missouri for a breath test. The breath test was administered to Driver at 2:16 a.m. using a "BAC DataMaster" machine. The test result indicated Driver had a blood alcohol concentration of .111%. Act-

---

1. In the Notice of Appeal that Director filed, Director incorrectly stated the spelling of Driver's last name as "Meyers." The record unequivocally indicates the correct spelling is "Meyer."

ing pursuant to section 302.505 RSMo,[2] Director suspended Driver's license for driving with a blood alcohol concentration of at least .10%.

Driver filed a petition for de novo review of the Director's action pursuant to section 302.535. At the trial de novo Director presented documentary evidence stipulated to by Driver, and Driver presented evidence including his own testimony and that of Dr. Terry Martinez, an expert witness in the field of pharmacology and toxicology. Following trial the court rendered a judgment finding that although Director had made a prima facie case as to both required elements, the prima facie case was rebutted by the "unrefuted" testimony of Driver's expert showing that Driver "did not equal or exceed a blood alcohol content of .10% at the time of arrest or operation of the motor vehicle." Accordingly, the trial court set aside Director's suspension of Driver's license and ordered that his driving privileges be reinstated. This appeal follows.

## DISCUSSION

In his sole point on appeal, Director asserts that the trial court erred in setting aside the suspension because the court's decision was a misapplication of law and against the weight of evidence, in that (1) the Director proved that Driver's blood alcohol content was at least .10%, and (2) Driver failed to present sufficient evidence to establish that his blood alcohol content was below .10% when he was driving.[3]

■ Our review is governed by the principles of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless the trial court erroneously declares or applies the law. *Wisdom v. Director of Revenue*, 988 S.W.2d 127, 129 (Mo.App. S.D.1999).

■ Under section 302.505, the Director makes a prima facie case for suspension of a driver's license by demonstrating, by a preponderance of the evidence, that (1) the driver was arrested upon probable cause to believe he was driving while intoxicated, and (2) the driver had been driving at a time when his blood alcohol concentration was at least .10% by weight. *Smith v. Director of Revenue*, 13 S.W.3d 700, 705 (Mo.App.W.D.2000); *Rhodes v. Director of Revenue*, 994 S.W.2d 597, 598 (Mo.App. S.D.1999); *Wisdom v. Director of Revenue*, 988 S.W.2d at 129. Since the trial court found that Director had made a prima facie case as to both elements but that Driver had rebutted Director's case as to the second element, only the second element is at issue in this appeal.

■ A prima facie case is made on the second element if Director establishes by credible and competent evidence that proper chemical analysis showed a driver's blood alcohol concentration was .10% or more by weight. *Rhodes v. Director of Revenue*, 994 S.W.2d at 599. Here, the Director's evidence, to which Driver stipulated,[4] showed that the BAC DataMaster analyzed Driver's breath sample to determine his blood alcohol concentration, that the Datamaster was a machine approved

2. All statutory references are to RSMo Cum. Supp.1999.

3. Driver did not file a brief on appeal.

4. Director's Exhibit A consisted of the Alcohol Influence Report, filled out by the arresting officer, who was also the officer that administered the breath test; it included, inter alia, an operational checklist for the DataMaster breath analyzer machine, and a certification of the breath test result showing that Driver's blood alcohol concentration was .111%. Additionally, Exhibit A contained, among various other documents, a three-page typewritten and signed narrative account by the officer of the arrest and breath test of Driver, a maintenance report of the DataMaster machine that was used, and information showing that the officer held a "Type III permit" entitling him to operate the DataMaster machine. Driver stipulated that the officer's testimony, if he had testified in person, would be as indicated in Exhibit A.

by the Department of Health, that the officer who administered the test held a valid permit to do so, and that the test was administered in a manner that followed the approved methods and techniques of the Department of Health. Once Director has presented such a prima facie case, the burden then shifts to the motor vehicle operator to establish by a preponderance of the evidence that his blood alcohol concentration was less than .10% at the time he was driving. *Rhodes v. Director of Revenue,* 994 S.W.2d at 599.

In the case at bar, Driver admitted to having consumed a rather prodigious quantity and variety of alcoholic libations in the hours preceding his arrest. He testified that he drank four beers between approximately 3:30 and 5:30 p.m. He stated that he then went home and prepared a large dinner for a group of friends and guests who were coming over to his house that evening. From approximately 7:30 p.m. until 10:00 p.m., he testified, in addition to having dinner and socializing with his house guests, he consumed eight "highball" drinks consisting of 7–Up and whiskey. He stated he then spent slightly over an hour washing pots, pans and dishes in the kitchen, during which time he did not drink. He and his girlfriend then spent approximately an hour relaxing in the hot tub with their last remaining houseguest, during which time he consumed a third of a bottle of wine. A little after 12:30 a.m., Driver testified, he decided to drive the guest to her home in Hermann, Missouri. Shortly before leaving his house to drive the guest home, Driver made himself a very large drink of bourbon and coke to take on the road. He testified that he filled a container the size of "the biggest cup McDonald's has" full of bourbon and coke, and that he consumed approximately one fourth of the contents of the cup sometime before leaving the house. Driver and his guest then left the house with Driver at the wheel, and Driver's vehicle proceeded several miles before being observed and stopped by the Highway Patrol officer.

Additionally, Driver testified at trial that he had a problem with high blood pressure. He stated that he had been taking medication and seeing his doctor for the problem for five years. He indicated that although he had seen his doctor numerous times over the years and taken various combinations of prescribed medications in an effort to control his blood pressure, it nevertheless was not until the last time he had seen his doctor—just one month prior to trial—that he felt he "finally was on the right track" in getting his blood pressure under control. He answered affirmatively when asked, on direct examination, whether at the time of his D.W.I. arrest he was "still struggling to find some combination of medications that would work" to alleviate his high blood pressure.

Driver also presented the expert witness testimony of Dr. Terry Martinez, who has a doctorate degree in pharmacology. Based on four factors, Dr. Martinez offered the opinion that Driver's blood alcohol content at the time of arrest was probably no more than .09%. For the reasons discussed more fully below, we conclude that the factors cited and relied on by Dr. Martinez, whether taken separately or cumulatively, do not constitute substantial evidence sufficient to rebut the Director's prima facie case.

(1) *Breath Analyzer Margin of Error*

Dr. Martinez testified that breathalyzers of the type used in this case have a margin of error of plus or minus 15%. He explained that this was due to the fact that the machine's software is based on a breath-to-blood ratio of 2,100 to 1—that is, an assumption that every 2,100 milliliters of lower alveolar breath will produce as much alcohol as would be in one milliliter of the person's blood.[5] As Dr. Mar-

5. See generally, David Polin, *Challenges To Use Of Breath Tests For Drunk Drivers Based On Claim That Partition Or Conversion Ratio Between Measured Breath Alcohol And Actual Blood Alcohol Is Inaccurate,* 90 A.L.R.4th 55,

tinez explained, the 2,100 to 1 ratio is only a statistical average, and the actual breath-to-blood ratio varies somewhat from person to person. However, he testified, the vast majority of persons fall into a range of "about plus or minus 15%" of 2,100 to 1; hence, the claimed margin of error for the machine.

■ We have visited this question before. In *Green v. Director of Revenue*, 961 S.W.2d 936 (Mo.App. E.D.1998), another case in which Dr. Martinez testified, the argument was made that the breath test result was unreliable due to the breath analyzer machine's margin of error. In squarely rejecting that argument, this court stated:

> Section 302.505 requires that a person's BAC be .10% or more to suspend or revoke the person's license for driving while intoxicated. It does not require the test result to pass the threshold alcohol limit of .10% within the .005% [sic] margin of error. [citation omitted.] Dr. Martinez's testimony as to the DataMaster's margin of error *was not substantial evidence sufficient to rebut the Director's prima facie case.*

*Green v. Director of Revenue*, 961 S.W.2d at 940. (emphasis added) We note too that a number of other courts have explicitly rejected the "machine-margin-of-error" theory propounded by Dr. Martinez, finding that although breath analyzer tests are of course not absolutely infallible, the great weight of scientific evidence shows that only a miniscule percentage of persons tested will ever show an erroneously high blood alcohol level. See *State v. Downie*, 117 N.J. 450, 569 A.2d 242, 245–248 (1990). As in *Green*, so here too, we hold that Dr. Martinez's testimony regarding the purported "margin of error" of the DataMaster breath analyzer machine is not substantial evidence sufficient to rebut the Director's prima facie case.

### (2) *Claimed Effect of High Blood Pressure*

■ Dr. Martinez also testified that Driver's high blood pressure could possibly have made the breath analyzer read falsely high, explaining that this was because high blood pressure can sometimes "cause a lowering of the blood/breath ratio." However, he also testified in the same answer that no one can ever know whether such an effect has in fact occurred "unless you measure it at that particular time." Thus, given that no such measurement was taken at the time Driver took the breath test, we hold that Dr. Martinez's testimony concerning the possible effect of Driver's possibly high blood pressure was no more than speculation. As such, it did not constitute substantial evidence sufficient to rebut the Director's prima facie case.

### (3) *Claimed Effect of Blowing Twice Into Same Mouthpiece*

■ Dr. Martinez also testified generally about what might happen when a person being tested on a DataMaster breath analyzer machine blows twice into the same mouthpiece; he opined that a second attempt through the same mouthpiece might produce a reading "a little bit higher, about .02 higher." He explained his theory that with a second attempt "you no longer have just alcohol from the lower part of the lung, ... you also have a mouthpiece that's contaminated with alcohol from the first attempt." We conclude that several factors, when considered and taken together, deprive this testimony of any substantial probative value.

First, the Legislature has mandated that blood alcohol content tests be conducted according to methods set by the Department of Health. Section 577.020.3. The record here clearly shows that that was done. In contrast, although Driver claimed the trooper "erred in failing to change the mouthpiece on the machine, Driver did not offer any Department of Health rule, regulation or guideline requir-

§ 2 (1991): "Lower alveolar" breath means deep-lung breath. *Id.*

ing such course of action." *Quick v. Director of Revenue*, 937 S.W.2d 408, 410 (Mo.App. E.D.1997).

Second, although Driver testified that he was asked by the officer to blow into the machine a second time several minutes after his first attempt, Driver never clearly testified that he blew into the machine on his first attempt with enough force to produce any effect at all. This is significant because in many cases drivers, either deliberately or perhaps inadvertently due to inexperience, fail on their first attempt to blow into the machine with any real force at all, let alone enough to produce a valid test sample. *See, e.g., White v. Director of Revenue*, 784 S.W.2d 861, 861 (Mo.App. E.D.1990). If so in this case, then the mouthpiece "contamination" that Dr. Martinez spoke of likely would not have occurred.[6]

Third, the record reveals that Dr. Martinez never testified that he could say within a reasonable degree of scientific certainty that the effect of blowing twice into the same mouthpiece caused Driver's test result to be .02% higher——or any higher——than it should have been. Rather, Martinez testified that he "guessed" that this might explain why the breath test result could have been falsely high. Such equivocation and qualification of the answer severely diminishes the expert testimony's probative value. See *Hamm v. Director of Revenue*, 20 S.W.3d 924, 927 (Mo.App. S.D.2000). Given the totality of circumstances, we find that Dr. Martinez's testimony concerning the possible effect of Driver's blowing twice into the same mouthpiece was not substantial evidence sufficient to rebut Director's prima facie case.

### (4) *Time Lapse Between Driving and Breath Test*

■ Dr. Martinez also testified that considering the breath test result and the time elapsed between the time of arrest and the time of the test, and considering also Driver's testimony concerning when and how much alcohol he had consumed over the course of the evening as well as the rate of human absorption of alcohol once ingested, it was his opinion that Driver's blood alcohol content was still rising somewhat at the time of arrest, and that Driver's actual blood alcohol content at the time of arrest was less than .10%.

It is generally recognized that alcohol consumption involves a metabolic process, and that a driver's blood alcohol content increases for a period of time after consumption and then begins to decrease as the alcohol is dissipated and eliminated through metabolism. See 2 D. Nichols, *Drinking/Driving Litigation* § 23.01 (1985). It is also true, of course, that a breathalyzer test only reveals the blood alcohol content of the motor vehicle operator at the time the test is given, not at the time he or she was driving. *Rhodes v. Director of Revenue*, 994 S.W.2d at 599, n. 2. Due to the fact that there is normally some time lapse between occurrence of a possible D.W.I. offense and administration of an alcohol test, it is to be expected that a test will not reflect the driver's exact blood alcohol content at precisely the time he was driving. See discussion in *State v. Kubik*, 235 Neb. 612, 456 N.W.2d 487, at 493–500 (1990). Thus, there can occasionally be instances, especially where a driver is stopped very shortly after ingestion of alcohol, where the driver's actual blood alcohol content was lower——and perhaps even below the legal limit——at the time he was stopped, compared to the breath test

6. We note too that Driver never unequivocally testified that the officer *didn't* remove the mouthpiece and replace it with a new one between the first and second time Driver blew into the machine. Rather, Driver testified that he "didn't remember" whether that was done. Additionally, we note that although he

does have general expertise in the field of pharmacology and toxicology, there was never a proper foundation laid showing that Dr. Martinez had an operator's permit, or otherwise had any particular expertise, in the minutiae of operation of a DataMaster breath analyzer.

result taken later which showed a higher reading. *Id.* at 496. By the same token, there are many instances in which, regardless of whether a drunk driver's blood alcohol level was rising or falling at the time of arrest, a relatively long delay between the time of arrest and the time of testing will *benefit* the driver, due to "the evanescent nature" of alcohol in the bloodstream. *Id.* at 497.

This is clearly such a case; and no amount of expert testimony can make it otherwise. By Driver's own admission he was drinking over the course of virtually the entire evening; he did not consume an especially large quantity of alcohol immediately before operating his vehicle; and the time lapse delay (nearly one-and-one-half hours) between the time he stopped drinking and the time of the breath test was quite substantial. These admitted facts and circumstances simply do not reasonably support a theory that Driver was "adversely affected" by the elapsed time between the time of his driving and administration of the DataMaster breath test— that is, that even though the test showed a blood alcohol concentration of .111% some *one hour and twenty minutes* after his vehicle was stopped, it would have validly shown a blood alcohol concentration of less than .10% if it had been administered immediately after the stop. We note that a very similar claim, again based on the expert testimony of Dr. Martinez, was raised by the driver and rejected by this court in *Green v. Director of Revenue*, 961 S.W.2d at 939, where we found it to be insufficient to rebut the Director's prima facie case. So too in *Rhodes v. Director of Revenue*, where the court also considered a very similar claim, the court likewise rejected driver's contention, specifically noting that the evidence favorable to the driver in that case was weaker than the evidence favorable to the driver in *Green*. *Rhodes*, 994 S.W.2d at 601. We find the same to be true in this case.

Finally, this is not a case where the whole of Driver's expert testimony is greater than the sum of its parts. We find that just as none of the above-discussed factors relied on and testified to by Dr. Martinez constitute substantial evidence sufficient to rebut the Director's prima facie case individually, neither do they constitute such evidence collectively.

For the foregoing reasons, we hold as a matter of law that the evidence in this case, even when viewed most favorably toward Driver, is insufficient to rebut the Director's prima facie case on the second required element namely, that Driver's blood alcohol concentration was .10% or more by weight at the time of driving. Accordingly, the judgment is reversed, and the case is remanded to the trial court with directions to enter judgment affirming the Director's suspension of Driver's driving privileges.

ROBERT G. DOWD, Jr., P.J. and MARY RHODES RUSSELL, J., concur.